Good morning. Tom Schlesinger for Orlee Lumiguid. May it please the Court, I would ask to share the 20-minute time allotted to the appellants and possibly reserve two minutes at the end. How are you sharing the time? I'm sorry. Ten apiece. Okay. Go ahead. The two areas of argument, there are three, the sufficiency, the matrimony, evidence, and the sentencing. The sufficiency and the matrimony are related. My client did not enter into an agreement with his employer to defraud Medi-Cal, and he did not have sufficient knowledge of the billing requirements to harbor an intent to commit the object of the charge, conspiracy, to defraud Medi-Cal. In order to be convicted of conspiracy, does your client have to have an agreement or does he have to know about the conspiracy and act to forward it? And are those different? I'm a little confused about that. Well, there has to be an agreement. I know, but does it have to be an agreement with him? There was an agreement, right? Does anybody doubt that there was a conspiracy? I mean, when I say there has to be an agreement, what I mean by that is that he has to have entered into an agreement. Is that true? I can't quite tell that from the case law, which seems to say at times there has to be an agreement, but not that the particular defendant has to have agreed. I don't believe so. I think there has to be an agreement that he entered into. It doesn't have to be direct. It can be proven circumstantially. I think it means not that he has to agree with the main conspirators, but that he has to agree to participate in that conspiracy. He may not even know the big shots, but if he agrees to take advantage and take benefits from the conspiracy and agrees with even underlings to be supportive of it, he's bought into the conspiracy, has he not, with an agreement? I would agree with that, but I think that there's something beyond knowledge of the conspiracy and the fact that there's an ongoing conspiracy that he may be somehow contributing to by whatever sense. That's the second point that I think you may be in a little thin ice. I mean, just knowing about it is not enough. But if you say, okay, I know there's this conspiracy, I know there's this agreement, and I don't know the big shots that have made the deal, but I'm going to cast my lot with them and I'm going to ride the ship and I'm going to contribute and get benefits from it. Isn't that enough? Well, no, I think there has to be an objective to defraud specifically this health care benefits program. Well, isn't he doing that by being a – signing on as a foot soldier, even though he was never asked to be part of the big agreement among the big shots? Well, he did sign on as a foot soldier in the sense that, yes, by being a so-called imposter nurse and not having the proper licensure. And also, wasn't he also convicted of aiding and abetting? There was no special verdict, so it's unclear as to what. No, I know, but I mean, that was among the charges against him. The – there was – yes, there was a section 2, but – And so – so, I mean, he could have been convicted under the aiding and abetting, as far as we know. As far as I know, that wasn't the government's theory and that's not what was argued. It was in the – was it not in the indictment presented to the jury? Yes, it was. Was it in the instructions?  That's what I thought. But the point under the Melchor case, the Melchor v. Lopez case – I thought evidentially the government has to prove an agreement. They have to prove that this – that there was a conspiratorial agreement and that the person they're targeting had some connection to it. There's got to be enough connection, some connection to it. They don't have to show that he sat down and there was an agreement. No. No, Your Honor. He doesn't have to have – Evidence. Because you're making an evidence argument, I believe. The – well, the argument was – So there's this conspiratorial agreement and this person was part of that. Not that he entered the agreement, but that there's some connection. Isn't that how it goes? Something like that? Well, actually what there were – there were basically two separate conspiracies. I'm asking about the principle. The principle is correct, but – The evidentiary principle is the government can just prove the agreement, can prove that he's involved in carrying it out. They don't have to come and prove that he entered into the terms of the agreement. They just say he's part of the thing. And it's very weak, in a way, connection. You just have to show the evidence that he had something to do with it. Well, it depends on what the thing is because – and that's what this was all about was the fact that the Rule 29 motion, the district judge even said that it was not enough for each defendant to know they were performing LVN services without a license, preparing the nursing home. Oh, he had to know – he did know he was providing LVN services without a license. He was operating – there was evidence that he knew that the patients thought he was an LVN and he fostered that appearance. He knew that they were being billed as LVNs. Not explicitly. There was some gossip about that between him and some coworkers at one of the job sites. He knew the exact amount of money that they were being billed. Not exactly. It was somewhere in the ballpark of what was being paid, but the source of that information was never disclosed. What's the difference with the source of the information? Well, the problem with that is, is that because of the motion in Lemonade to exclude this evidence of marriage between him and the co-defendant is the fact that the jury was allowed to impute a lot of things to what he knew beyond the possibility that the registry was billing his time as an LVN. How could they have excluded the knowledge of the marriage when you couldn't really understand what was going on here without it? Not having to do with what she may have told him, but wasn't there a point at which he was getting paid through her and she was getting her health benefits through him and so on? Well, no. What it was was basically a paperwork issue concerning a couple of the pay periods where insurance was taken out of his paycheck and some of her wages were being paid to his paycheck. But none of the issues surrounding those events were really collateral to the government's proof in terms of what needed to be proven. They had different names. Wasn't the jury instructed that he couldn't be held guilty just because of knowledge that she had? Not specifically. The only thing that they were instructed on at closing was the fact that basically each defendant stands on his own and that you have to prove the elements as to each. And jury, you can't convict him just because he's married to her. There was no specific instruction given in that sense, in that literal sense. All that was charged to the jury at the end was the fact that each of the six defendants on trial have to be... You have to look at what the evidence was as to them. As to them. Not as to anybody else like spouses. No. That second part was not in the instruction. And so that... And there was a representation made at the motion in Limine that the government was going to connect all that up. That, in fact, the source of the... I guess the next question is why isn't it pertinent to his knowledge? I mean, if somebody... Suppose somebody was very close friends and spending a whole lot of time in the house of the perpetrator of some crime. That wouldn't prove that he was... Certainly, I mean, there's all this law about bystanders aren't criminals. But it's not irrelevant. It's a relevant fact, isn't it? It's not really relevant. That they know each other and that they're talking to each other and that makes it more likely that that information is being conveyed than if they didn't know each other. I just don't think you can draw that inference. First of all, these were like two ships in the night. One was working... Like a submarine crew. One's working days. One's working nights. One's in the office. One is not. And so to the extent... To the degree that they discussed any of these matters is unknown to us in the record evidence presented. So that was the whole point of the objection to... Wasn't there some evidence that after she started working in the office, just as she put her own... The name of her own parallel LVN person down on hers, that she put the name of his person on his before she added everything? I don't recall that either, Your Honor. The surrogate LVN for him was a guy named Gino Solano. And I thought that she was putting that name in before she was handed it because she was handing his forms in and she was putting the name in. I don't recall that evidence, Your Honor. I do recall evidence that she was putting the name Myra Navarro for her sheets. What we did have was at the very beginning, Mr. Lumengood was putting his own name, Orly Lumengood, to the route sheets. And then he was instructed by the office staff, in particular Ms. Tesoi, to refrain from doing that. So he was then handing in the route sheets blank. And the court, in acquitting three convicted defendants, said the fact that they submitted route sheets blank was not enough to carry the day, in his opinion, and thereby granted... Was there further evidence from him or about him also, though, that he knew things weren't quite right? Just like all the other defendants, some of whom were acquitted, yeah, that there was monkey business going on in the main office, which was... And if you get allegedly inconsistent verdicts, somebody getting acquitted, somebody getting convicted, isn't the general rule that we don't know whether your co-defendants got lucky or whether you got unlucky? But that's their discretion. Well, I couldn't speak to that in terms of luck, because... Well, I mean, we don't require always rational consistency. But this wasn't a jury that acquitted him. It was the judge. Yes, Your Honor. That's true. That's true. But the judge at the district court level did take into serious consideration the import of the Salerno decision. You know, you used about 11 minutes of the 10 minutes. Yes. I will ask to reserve. Thank you, Your Honor. Good morning. George Steele on behalf of Moss, Acuora, Narciso. I'd like to make the same time arrangements as Mr. Schlesinger, 8 and 2. This case truly evolved from its inception until when we got to trial. Now, when we started this case, it was pitched, and they were taking pleas of a large number of nurses. And the thrust of the case, the posture of the case, was clearly that the problem was nurses practicing without licenses. Now, as we got into trial, it became clear that the six defendants that went to trial took issue with that, didn't think the issue was about that, but was about billing, and billing only. It had nothing to do, except in a tertiary sense, with the practice of whether anybody is practicing nursing without a license. Well, it had something to do with it, because... It did. It did, yes. But it did in the sense that it enabled the people, the actual conspirators, which were a separate group than the nurses. The conspirators were the actual people who billed. The nurses did no billing. And how do we see that manifest itself? By the end of the trial, the court apparently understood that for three of the co-defendants. Now, naturally, my client and her husband did not benefit from the court's analysis, but that is, in fact, what I'm here to discuss, because I think that was an error, and I think the record makes that clear. A couple of things that suggest, that really support what I'm saying about the evolution of this case. The person who actually submitted each and every bill, was neither indicted nor brought as a witness. But it doesn't stop there. When they interviewed people about that woman, they didn't ask her anything about what my client had done with respect to billing. The people that interviewed my client didn't ask her anything about what she had done with respect to billing, those being the agents who interviewed her. What is the relevance of all this? I mean, I agree that there are substantial and interesting questions about why this case was brought against whom. But that's not quite our problem at this point. I believe our problem is that my client didn't understand the object of the conspiracy, and there's no evidence that she did. What differentiated my client from the other three that the judge acquitted at the Rule 29 stage, was that he felt that she, because of her work in the office, was exposed to billing issues and therefore had knowledge. Wasn't there evidence that she didn't state that she pretty much knew what was going on? I don't believe so. And that if we're referring to the statements she made to the agents, those are all very broad. And if you read the text of those statements, everything comes back to the use of G2s, the use of nebulizers. You knew something was wrong. You knew this, you knew that. Now, what the inference seems to be being made, which I think is an error, is that if you knew something was wrong, you had to know the object of the conspiracy. And I think that's simply not true. For example, here we've got a fee-for-service construct with respect to Medicare. Somebody does a service, there's a fee paid on their particular standing within the categories of billing. What if it had been a capitated system? A capitated system in that a fee is given for each patient, it's a cap fee, that's what you get, and we aren't going to inquire as to how you do it. This is very common in health care. You see them in HMOs, and that was what drove a lot of the HMO litigation that existed for quite some time, because then the HMO or whoever the care provider is, is now incentivized to deliver care at the lowest cost possible. In this case, the way it would manifest itself for somebody who's standing in the position of a nurse, who lacks a license, knows she lacks a license, but is working, is that this person who is employing them is trying to pay the lowest salary they can so they can maximize their profit by skimming off the cap fee they had. Now, that's one scenario that could have existed. The point is that none of these nurses knew what the situation was. Going back to what Judge Fease had ruled on as his belief, that because he was in the office. But your client was signing somebody else's name to her sheets, right? She signed on two occasions someone else's names, actually initials. Okay. And if I understand what the question is. Okay. Pardon? At least knew that there was some reason why, A, that that wasn't true, it wasn't that person who provided the services. B, that somebody wanted her to say there was, that they weren't providing those services, that the other person was providing the services, presumably, B. And she knew that she wasn't an LVN. I don't know whether she knew who the other person was, but even if she didn't know who the other person was, she knew that for some reason they wanted, it was beneficial to them to have her lie as to who was providing the services, right? But in order for her to be guilty of conspiracy, she's got to know the object of why she's being asked to lie. It's one thing to say. For billing to the government, no? Not necessarily. There may not be any billing to the government. It might be marketing to the. . . She didn't know that everything was being paid by Medicare? She knew it was all being paid by the government, but she didn't know that there were billing codes that were designated by the license or lack of license by the person who was delivering the care. That she didn't know. And that's. . . And what I'm getting to is that. . . So why would she need to know that detail of the conspiracy? Because that was the exact conspiracy. There was no. . . But if you knew that the purpose of the conspiracy was to bill Medicare for services that weren't being provided by the qualified people, that degree of generality ought to be enough without knowing codes and things like that. I would disagree, Your Honor. And for this reason, care is being provided. The care is being provided in a good fashion, and all evidence supports that. The irony of this entire thing is that the conspirators could have done all of this legally if they had just taken a lower profit margin. They could have billed out the same people doing the same work as unlicensed health care providers, and there is a code for that which they could avail themselves of. So to say that they knew that a nurse knew that they were being designated as something else doesn't quite solve the problem or square the circle with respect to conspiracy because they've got to know that specifically what they're doing is providing care that someone else is charging at a rate as to, for an example, a paralegal being charged out as a lawyer. They've got to know that that's what's going on. That is not what was occurring here. And the evidence supports that because the audit manager specifically stated that when the audit occurred that Judge Fies relied on in denying the Rule 29 as a my client, they did not audit on billing. They only audited as to care sheets, route sheets, whether or not paperwork, administrative issues, those sorts of things were included. Specifically excluded was billing. And billing was what he relied on to find that she was different than the other three defendants, and that was simply in error. And the record is clear on that. What's also clear, referring back to the evolution again, the absence of Faye Medina. Now, Faye Medina was a late-acquired, late-for-us-located witness. She makes clear that Ms. Narciso had nothing to do with billing. Whether a trial is granted or not based on issue, what is important, at least for the short term here, is that's consistent with all the evidence that was adduced at trial as to Ms. Narciso's involvement with billing, which is to say Ms. Tsoy, the person who gave the bulk of the testimony regarding it, had no knowledge of what she was doing in terms of billing. The agents didn't ask and had no knowledge of what Ms. Narciso was doing in terms of billing. All they had was physical proximity to an office where billing was occurred or was occurring, and a contrary testimony of each and every witness who stated that Ms. Medina did all of the billing and no one else did it. So when Judge Fee says that Narciso learned of the rates paid to real LVNs and that would allow Excel Plus to make more money, is that not in the record or not adequate if it is in the record? I think it's not adequate because, as I said before, depending on what the billing scheme is, making more money may not involve the person who's doing the work participating in the conspiracy. If it's a capitated fee, it makes no difference to the person working with respect to this as to whether or not they're being designated an LVN or an unlicensed nurse because that information does not go back to the government if the government isn't doing fee-for-service. If the government says, I'm going to give you $100 for every child that you treat and ends it there, you'll be only $100 and that's it. Now, if they hired licensed personnel, their expense for treating that child might be $50. But because they choose unlicensed personnel, their expense is $35. Is that what was happening here or what was happening here was that the billing did depend? No, what was happening here was the other way. My point is, is that the nurses, in particular my client, had no idea of which situation it was. And not knowing the specific objectivity of the conspiracy made someone not liable for conspiracy. You're saying, I mean, you're requiring knowledge of all the particulars of a conspiracy. You don't, you're saying it's not enough just to know that there are some false billing things going on and that it's billing that goes to Medicare. You're saying that's not enough. She didn't even know if bills were going to Medicare. All she knew is that the company made more money if they paid them less. That's all she knew. That's all any of the nurses knew. She was involved in it a lot more than Medina. I mean, she was in the billing office for a while. She dealt with a variety of other people, Tisoy. I disagree, Ron. I think that's incorrect. No, Faye Medina was the person in charge of billing. She might have been the person in charge. But we'll just see what the record shows. If we could, Your Honor. To be clear, though, Ms. Narciso worked in that office for a very short period of time to give some assistance for a specific time frame in which they were being audited for administrative issues. She did not work in there. She was a nurse. I just want to briefly touch on statutory issue. The exclusion of the Statutes 2727 and 1347 were important insofar as explaining, again, what my point is, which is that if you can't understand the law, you can't understand the scheme. The law is very particular. Not being able to explain the law to the jury, prejudice or defense, and that we couldn't explain these things in enough clarity to make it clear. Clearly, he didn't, the judge didn't need that for the other two defendants because he acquitted them. But with the wrinkles, the additional evidence that existed against my client, it was important to be able to present the statutory framework. Okay. Your time is up. We will wrap up. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. My name is Consuela Woodhead, and I'm appearing on behalf of the United States. The evidence against both of the defendants in this case was not just substantial, it was almost overwhelming. With respect to Defendant Lumaguid, he expressly admitted knowingly participating in a large fraudulent operation. Well, he admitted that he knew that the people he was working for were committing fraud. I'm not sure that's the same thing as admitting a participation in a conspiracy. He was asked the question, did you know you were participating in a large fraudulent operation, something that was just as dirty as the day is long, and he answered yes. And then he was asked the question, and you decided to participate in it anyway. That's it, GER 79798. And he answered yes. And was the issue of aiding and abetting submitted to the jury? Yes, Your Honor. I believe it was. The defendant was convicted both of the conspiracy and of one substantive count of health care fraud for a particular claim that was submitted for a particular patient that he visited. So then aiding and abetting was one of the charges, right? That's correct. And causing an act to be done. The defendant participated in this game, decided to participate, and did participate by making visits to patients, telling the parents he was an LVN when he was not, using the fake name Bob, deliberately leaving the signature line on his route sheets blank, knowing that his employer was going to use someone else's name for the visit. How did he know that? He acknowledged that in his recorded interview, excuse me, GER 776-79 and 791. He considered his activities to be fraud that benefited the office, which read in the light most favorable to the government, can be interpreted as meaning that allowed the office to make money it would not otherwise have made. In fact, he said he would say or do whatever he was told to get the paycheck. That is an indicator of agreement. And he says he finally left because he was guilty and didn't want to continue. Now, I may have misspoken. His interview did not explicitly reference the fact that the fraud was fraud on the Medi-Cal program. But his knowledge that it was was shown by the testimony of two, and arguably a third witness, two coworkers, Randy Hovere and Alfredo Devera, each of whom worked with the defendants at two different homes, each of which had multiple disabled children. And defendant discussed with each of them the economics of the conspiracy, the split, how much the government was paying and how much each of them were getting and how much a real LDN would get. With Hovere, he discussed the fact that the government was paying $27 to $29 an hour. With Devera, he discussed that Medi-Cal was paying $28 to $30 an hour. My understanding of the attorney for Ms. Narciso's argument is that all of that could have been true, and yet it could have been the case that they weren't, there wasn't fraudulent billing. Because if the billing were not based on, unless they knew that the billing was based on them being LDNs, then the fact that there was a, that they were making money and they were not being LDNs and that they were billing the government wouldn't necessarily show that there was fraud. Well, certainly with respect to Defendant Lumigrid, one of the things they talked about, he talked with Devera about, was that they were, or Hovere, was that they were getting more money from the government by pretending to be LDNs. And so there was that knowledge. Was the program specifically qualified from the government? Yes. Yes. And then the witness went on to say, and we learned while we were there that the specific program was Medi-Cal. So it was not only from the government but from Medi-Cal. What is our standard on review about what weight and what interpretation we give evidence on this appeal? I think on this appeal, the court is governed by the standards set forth in Jackson v. Virginia and Nevels, which is that all of the inferences from the evidence must be interpreted in the light most favorable to the government. And once the evidence is viewed that way, then the court must determine whether the evidence was sufficient to sustain a verdict. And certainly, viewing this evidence in the light most favorable to the government, each of these defendants knew that this was basically a product substitution case. They were buying Kia's and billing for Cadillac's. They were hiring unlicensed caregivers, and they were billing for skilled nursing services. And only one person actually has to know the code. Only one person has to perform the act of doing the billing. That doesn't indicate that the other conspirators are not knowledgeable about the object. What was the difference, the factual differences between Mr. Lumigid, if that's how you say his name, and the defendants who were acquitted in the Rule 29 motion? Well, let me focus on the one that Mr. Lumigid did in his brief. That was Defendant Ruth Magracia. She engaged in less deceptive conduct because she used her real name when visiting patients. She had very, very little contact with the office. She just mailed in her notes to the office. She quit promptly after the search, and he, by contrast, just upped the ante of fraud and had his payments routed through a real LVN to keep his name off the books. She was honest in the interview, readily acknowledged that she was hired as a caregiver, but doing the job of an LVN. Most significantly, perhaps, if you heard her interview, and the court can most easily see it by looking at the opening and closing arguments of her lawyer, she appeared to think that the main issue here was a quality of care issue. She seemed to think that the monkey business was because they weren't actually nurses, and this posed an actual risk to the patient, sending out people that did not have enough training. And she commented how she wouldn't do this if she were at cell and they should be providing more training. So she appeared to view the parents as the targets of the deception, and there was absolutely no mention of money at all in her interview or in any of her admissions. Also, with respect to her, there were certainly no witnesses like Hover, DeVera, and Goosey, and there was no, you know, actually working in the office as there was with Narciso. Your Honor, Judge Berzon, you were correct when you said there was evidence that Narciso signed LumaGwid's route sheets. That's at GER 97, and I do want to take issue with one thing. The Narciso interview was quite clear, and certainly it was viewed favorably to the government, that once defendant Narciso went into the office, she found out a lot of things. She found out things they didn't want people outside the office to know, and she found out, quote, what was going on, which can reasonably interpret it as a fraud on the Medi-Cal program. And at that point, she routinely started forging the name of Myra Navarro on her own route sheets, not just initials, but the name Myra Navarro on route sheets and skilled nursing notes. The controlling law or the applicable law in this case is really the principle set forth in Narciso's brief at page four, a reply brief, in which she quotes from U.S. versus Dunn, where persons are clearly connected to the conspiring group or are found acting in such a way as to unmistakably forward its purposes, then slight additional evidence suffices to base an inference that one who had been shown beyond a reasonable doubt to be a participant was as well a knowing participant. The evidence here is I can ‑‑ I'm still a little baffled about what it means that you're connected to the conspiracy and you know about the conspiracy, but do you have to ‑‑ and you may take acts that forward the conspiracy, but you don't have to actually be part of the agreement that is underlying the conspiracy? Now, suppose you have a conspiracy that hires a janitor, okay? I'm sorry, hires a janitor. A janitor, somebody to clean up the building where the conspiracy is going on. He knows there was a conspiracy going on there. He has a connection to it because he's working for them, and is he guilty? No, nor would I say in this case were real LVNs who went out and made visits and knew that their coworkers were unlicensed LVNs. Even if they also knew that their names and codes were being used by the others? Well, if that were the case, that would make it different altogether. In this case, that hadn't occurred. I'm just trying to understand what it means to participate in the conspiracy and know the conspiracy, be connected to it. I mean, I don't know why my janitor example wouldn't be all of that. I mean, he goes in there every day, he talks to the people who are there, he cleans up their offices and so on. How do those words cut off what we all instinctively believe, which is that the janitor is not a conspirator? The janitor is not himself engaging in conduct that's at the core of the conspiracy. But the language is that there has to be a slight connection. That's what I'm trying to understand, this doctrine which seems to have such loose language, if you take it seriously, that it's not helpful because it can't be what we mean, as what you just said exemplifies. You say, well, they have to do something at the core of the conspiracy. That's not a slight connection. So I don't understand what that language means and what we're supposed to do with it. Well, in this case, I don't know that the court actually has to worry about it, because you are inviting people. Well, these are, I mean, I've looked at a bunch of, I just did a very loose survey of a bunch of recent health care fraud cases. And at least Lumigant is far, you know, down the line from anybody who was prosecuted in any of those cases, from what I could tell. I mean, at least it's an unusual case in the sense that you're prosecuting people who are making $13 an hour, not a penny more, are not profiting by any of this, except for the $13 an hour, which is really not profiting, because they're being, if anything, underpaid, or they're not being overpaid. So if you're looking for an outlier case, this in some ways is it. And I'm trying to understand why, even though it's an outlier case, there are some set of words that encompasses Lumigant. Because Lumigant was an admitted imposter. He went out and represented himself as a licensed vocational nurse performing skilled nursing services. But he did have to. But that wouldn't have mattered if it didn't affect the billing. That's true. If it didn't affect payment. But it didn't affect his payment. For the money. It didn't affect his payment. Well, I don't know, Your Honor. I think it did affect his payment. He would not have had this job but for his willingness to engage in, to participate in this deceptive conduct, to go out and hold himself out as a guy named Bob, who's a licensed vocational nurse with a background and skill to perform these nursing services. I would say it's an outlier of the case, an outlier of a case in the sense that it is an example of a situation where the government saw a situation that was spiraling out of control, the use of unlicensed nurses to provide services that really should only be performed by and paid for as if they're being done by real licensed vocational nurses. But it is not an outlier of the case in terms of the proof of the defendant's knowing participation in the conspiracy. I gather what Mr. — what Ms. Narciso's lawyer wanted to demonstrate, and I couldn't tell whether it did demonstrate it, was that in fact her providing — their providing these services was not illegal under California law. Does that matter? That — No, it does not matter. If they went out to these patients' houses and just sat there all day, they wouldn't have violated California nursing law, but they would still have been participating in a fraud because Medi-Cal would have been billed for licensed vocational nursing services when people were just sitting there. So, no, it didn't. Nor did it prove the point that he wanted to prove. As the Court pointed out, the law that he cited said that a defendant, someone who is carrying out orders prescribed by a licensed physician and not assuming to practice as a professional nurse doesn't violate the Nursing Act. His client was not carrying out medical orders prescribed by a licensed physician because the physician orders as set forth in the plans of care, which are in the exhibits, required licensed vocational nursing services, and she was assuming to practice as a professional nurse, namely a person named Myra Navarro. So the Court acted entirely appropriately in refusing to, declining to put that irrelevant statute before the jury. I'm not sure. Have I answered the Court's question about the knowing participation? Well, you've answered it. You've given an answer. If I may go back to Defendant Lumagwid for a minute because I think it illustrates the point. In Lumagwid's brief on appeal, he admits that there was a conspiracy and scheme at Excel to defraud Medi-Cal. He admits he engaged in conduct that, in fact, furthered the scheme, and he admits that there was evidence, he says suggestive, I would say compelling, that he knew his employer was defrauding Medi-Cal. At that point, Your Honors, I would submit that the only thing the jury needed to do was apply the standard jury instruction it was given, which is that it was entitled to infer that a defendant intends the natural consequences of its actions and one arrives at a fully justified verdict. Intended what? Intended that the fraudulent billing occur? Yes. Intended that Medi-Cal pay for something. He probably didn't care one way or another whether the intended billing occur. It's not a question of hearing. It's a question of if his boss – I mean, the only consequence of this, I gather Maybe this is wrong, but if his boss had billed less for him, but still made a profit and still paid him, he would have been perfectly happy. But you're saying he couldn't have done that because he had to be an LVN or they couldn't have billed him at all. That's correct. They were billing for skilled nursing services, and he was not a skilled nurse. That's why I said it's like billing for a Cadillac and providing a Kia. They just weren't providing – Of course, the irony is that they were probably perfectly good at doing what they were doing. Nobody suggested they were. The evidence did tend to show that. That's correct, Your Honor. So really nobody was hurt except the government paid more than it should have. Not to him. Not to him. That is – But not to him. He obtained roughly 45 percent of every dollar that the government paid out that shouldn't have been paid. It sounds like the real problem here is the government requiring LVNs for things you don't need LVNs for. That's an issue that's well beyond the scope of appeal. And certainly if the parents wanted to pay, Your Honor, they could have had anyone do whatever they wanted them to do. But this was a case where, as these defendants well knew, claims were being submitted for LVN services to the Medi-Cal program. And that's what these patients' doctors ordered. I don't know that the burden falls on the Medi-Cal program or that the Medi-Cal program should be blamed for paying this. But the fact is that the doctors, the patients' doctors ordered LVN services. And they must have known that because they knew that their timesheets were being signed in some case by LVNs on behalf of the claimant. Actually, they were being forged by Rosemary Labison. But they had to know that there was – that that was a critical part of the process. I completely agree with that. What is the evidence that Lew McGrinn knew that? He knew that he wasn't signing it, but what did he know? I'm sorry, he knew that he was not signing it and that he was – that Excel would use someone else's name for his visits. He knew that? I think so, yeah. I think that's a fair inference from the admissions he made together with the other evidence. I suppose he might have thought that a supervisor was supposed to be signing it. It said – no. I don't think that's even remotely a reasonable inference from the record. What we're talking about signing here are route sheets that purport to show exactly when he visited patients, dates and times, and skilled nursing notes where he writes everything that he did to the patient. And then there's a line at the bottom, nurse's signature. It's clearly, just looking at the form, and they are in the excerpts of records, it's clearly the person who did all these things that is supposed to be signing it. It's really like saying – I think one of them used the analogy of a law firm. It would really be like a paralegal doing a whole lot of work and the partner signing his name on it. Okay. Thank you very much for your argument. Your time has expired. Unless you – either of you is dying to say something, I think your time is up and we will be adjourned for the day. Are you standing there dying to say something? You had no time left, but I will give you a minute. Oh, thank you. I just want to quickly respond to a couple of things concerning Mr. Leumannquist. Just like the janitor would be aiding and abetting a scheme that he knows about, this is what Leumannquist was doing. He had no – there's no record evidence to show that he knew that an LVN would be signing these route sheets and nursing notes. Those route sheets and nursing notes weren't even submitted to Medi-Cal. They were just kept in a file repository. He must have thought it was slightly odd that he was being told not to sign them. That could be for any number of reasons, as the Court pointed out. There was no indication that anybody told Leumannquist don't sign them because a real LVN is going to sign those notes. That wasn't the case. Okay. Thank you. Ten seconds, Your Honor. All right. Ten seconds. Thank you. May it please the Court. Just in direct response to an assertion somebody made here, I'm referring to Government Excerpt of Record, page 156, and it is a testimony of Agent Scott, the FBI agent who was the lead investigator, one of the lead investigators in this investigation, referring to Ms. Narciso. Question. Okay. So you know for a fact that Ms. Narciso was not one of the billers, correct? Answer. I do not believe she was a biller. I have no information that she was. Okay. Thank you very much. Thank you, counsel, for your arguments. The case is of United States v. Leumannquist and Narciso. This is submitted and we will adjourn for the day. Thank you.
judges: Ebel, Fernandez, Berzon